of Nold became due, the institution, in part payment thereof, gave to Nold the check in question; and he thereupon indorsed and delivered it to the defendant, as cashier of the institution, in payment of the bill of goods. The institution in the conduct of its business kept two separate cash accounts,—one of maintenance funds, and the other of manufacturing funds; drawing checks on each account according to the nature of the transaction. If it paid a debt that it owed for manufacturing material, it paid it out of the manufacturing fund; and, if it owed a debt for maintenance supplies, it was paid out of the maintenance fund. The accounts were kept in the Second National Bank in the name of the treasurer of the reformatory. It was the duty of the defendant when he received this check to have deposited it in the bank to the credit of the proper account. Instead of doing that, he indorsed it, and, as the evidence tended to show, appropriated it to his own use. It was presented at the bank, and paid to other parties. The check represented so much money belonging to the institution, and its negotiation and misappropriation deprived the institution of that amount.

In the course of the trial the prosecution called as a witness one Bush, an accountant, who testified that he made an examination of the books kept by the defendant, covering the entire period that the defendant was there in charge of the cash books. He was then asked to state the result of that examination. The objection was made on the part of the defendant that it was not the best way of proving it; that the books were the best evidence. The objection was overruled, and the defendant excepted. The witness answered that he found a deficiency of about $1,300. We think that this exception was well taken. The books were in possession of the institution, and the defendant was entitled to have them in evidence. Brayton v. Sherman, 119 N. Y. 623, 23 N. E. 471. It was competent for the prosecution to show, on the question of intent, that the act in question formed part of a series of similar occurrences within reasonable limits as to date. People v. Shulman, 80 N. Y. 373, note; Com. v. Tuckerman, 10 Gray, 173. The best evidence, however, should be given. We cannot say that the error in this respect was not prejudicial to the defendant, and therefore there should be a new trial.

Judgment reversed, and new trial ordered. All concur.

---

(36 App. Div. 112.)

CONTINENTAL NAT. BANK OF NEW YORK v. TRADESMEN'S NAT. BANK OF NEW YORK.

(Supreme Court, Appellate Division, First Department. January 13, 1899.)

1. BANKS—RAISED PAPER—RECOVERY OF PAYMENTS.
    To entitle the drawee bank to recover money mistakenly paid on a raised draft, the payment must have been made without culpable negligence on its part.

2. SAME—PAYMENT THROUGH CLEARING HOUSE.
    A bank draft was certified by the drawee in ignorance that it had been raised. It was then deposited in another bank, and on the next day included in the drawee's clearing-house balance, which the drawee paid in the usual manner. On receipt of the draft, the drawee's check clerk

compared it with the certification book, and canceled it. *Held,* that the draft was paid when so canceled.

**3. SAME—RECOVERY—NEGLIGENCE—QUESTION FOR JURY.**

A bank having an active account with the drawee bank drew a draft, No. 2,269, for $76, payable to T., notice of which was given, according to its custom, in its daily letter of advice of drafts drawn that day, which the drawee received, and filed, to be checked off as the drafts were paid, on the succeeding morning. Six days later, the draft was presented for certification, having been raised to $7,660, and the date changed to the day preceding presentment. The bookkeeper pronounced it "all right," and it was certified without checking the advice, and entered in the certification book without entering its number, as was customary; and, on the bookkeeper posting from the certification book, he noticed the omission, remembered that no advice for a draft of that amount had been received, and notified the general bookkeeper. The payee deposited the certified draft on the same day, and it was received by the drawee through the clearing house next morning, at 10:30 o'clock, when it was compared with the certification book, and canceled, between 11 and 1 o'clock. Defendant bank, in which it was deposited, having received no notice from the drawee, paid the amount to its depositor; and at 4 o'clock the drawee's bookkeeper took the canceled draft from its receptacle, and by comparing it with the advice, and by inquiry from the drawer, discovered the forgery, of which defendant was at once notified. *Held,* that whether the drawee had been so negligent in paying the draft as to prevent it from recovering the amount paid from defendant was a question for the jury.

**4. SAME—AMOUNT RECOVERABLE.**

Where a bank paid out part of the proceeds of a deposit, consisting of a raised draft, relying on the certification of the drawee before notice of the alteration, the drawee, having certified and paid the draft, in negligent disregard of facts which would have shown the forgery, can recover from it only the amount of such deposit remaining in its hands.

Appeal from trial term.

Action by the Continental National Bank of New York against the Tradesmen's National Bank of New York. From a judgment for plaintiff, defendant appealed. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and INGRAHAM, JJ.

Charles E. Rushmore, for appellant.
George W. Wickersham, for respondent.

INGRAHAM, J. On June 7, 1894, the Philadelphia National Bank, a depositor in the plaintiff bank, drew a draft upon the plaintiff, with the serial number 2,269, dated on that day, and payable to Henry F. Thompson, for $76. This draft appears subsequently to have been altered by changing the date from June 7th to June 12th, and the amount from $76 to $7,660; and, so altered, it was presented on the 13th day of June, 1894, at the plaintiff bank, and certified by its paying teller. On June 14th (the following day), the draft was presented by the defendant to the plaintiff at the New York Clearing House, and paid by the plaintiff to the defendant. The plaintiff subsequently brought this action to recover the amount so paid, less that for which the draft was originally drawn. The question as to the right of the plaintiff to recover back this money may be viewed in two aspects: First, with reference to its liability on the certification of the draft, on June 13th; and, second, respecting the

right to recover the amount paid to the defendant, such payment having been made on June 14th, and in the regular course of business. In the view we have taken of this second aspect of the question, it is unnecessary to discuss the obligation of the plaintiff to the defendant, the holder of the draft, in consequence of the certification on June 13th.

In an action for money had and received, "the plaintiff's case depended upon the question to which party, plaintiff or defendant, does the money, ex æquo et bono, belong? If to the plaintiff, it was because the facts created an indebtedness to him from defendant. In this respect the action has been frequently stated to be an 'equitable one'; that is, one depending upon the general principles of equity for the maintenance of the plaintiff's claim to the money. It is the most favorable way in which a defendant can be sued. He can be liable no further than the money he has received, and against that he may go into every equitable defense upon the general issue. He may claim every equitable allowance, etc. In short, he may defend himself by everything which shows that the plaintiff, ex æquo et bono, is not entitled to the whole of his demand, or any part of it." Chapman v. Forbes, 123 N. Y. 536, 26 N. E. 3. The right of a bank to recover the amount it has paid, under a bona fide mistake of fact, to a person presenting to it a raised draft, is clearly established. The form of the action in which such a recovery can be had is that for money had and received. White v. Bank, 64 N. Y. 319. In such a case, the defendant may, upon the general issue, show any fact to defeat the action which would make it inequitable to allow the plaintiff to recover; and, if it appears that it would be inequitable to throw the loss upon the person to whom such check or draft has been paid, a recovery will not be allowed.

As was said by Mr. Justice Story, in United States Bank v. Bank of Georgia, 10 Wheat. 343:

"In respect to persons equally innocent, where one is bound to know an act upon his knowledge, and the other has no means of knowledge, there seems to be no reason for burdening the latter with any loss in exoneration of the former. There is nothing unconscientious in retaining the sum received from the bank in payment of such notes, which its own acts have deliberately assumed to be genuine."

This rule is stated by Lord Abinger in Kelly v. Solari, 9 Mees. & W. 57, as follows:

"The safest rule, however, is that if the party makes the payment with full knowledge of the facts, although under ignorance of the law, there being no fraud on the other side, he cannot recover it back again. There may also be cases in which, although he might, by investigation, learn the state of facts more accurately, he declines to do so, and chooses to pay the money notwithstanding. In that case there can be no doubt that he is equally bound."

And this rule has been followed without exception in England and this country. A drawee, when a bill or check is presented to him, is bound to use such knowledge as he has of any alteration or defect in the bill or check; and if he, having knowledge that the bill or check is forged, pays it, he will not be allowed to say that he paid it under a bona fide mistake of fact. Thus, it is settled that

where a check is paid on presentation to the bank upon which it is drawn, and the name of the drawer of the check is forged, the payment was not made under a mistake of fact which would justify a recovery of the money paid. The ground of this rule is that the drawee is chargeable with knowledge of the signature of the drawer.

In Daniels on Negotiable Instruments (section 1362) it is said:

"In all the cases which hold the drawee absolutely estopped by acceptance or payment from denying the genuineness of the drawer's name, the loss is thrown upon him, on the ground of negligence on his part in accepting or paying until he has ascertained the bill to be genuine."

And Judge Ruggles, in Bank of Commerce v. Union Bank, 3 N. Y. 234, says:

"This rule is founded on the supposed negligence of the drawee in failing, by an examination of the signature when the bill is presented, to detect the forgery, and refuse payment. The drawee is supposed to know the handwriting of the drawer, who is usually his customer or correspondent. As between him, therefore, and an innocent holder, the payor, from this imputed negligence, must bear the loss."

Thus, where the law imputes to the drawee of a check or draft knowledge of the signature of the drawer, the payment of the check or draft by the drawee prevents him from recovering back the money, as the drawee was negligent in not employing the knowledge imputed to him; and, as between the drawee and a bona fide holder of the check or bill for value, such bona fide holder will be entitled to retain the proceeds in his own hands. But where the forgery is not in counterfeiting the name of the drawer, but in altering the body of the bill, the drawee is not presumed to know the handwriting of the body of the bill, and is not chargeable with knowledge of the alteration in the bill itself so long as the signature of the drawer is genuine; and, where he has paid such an amount without notice that the bill has been raised or altered, he is entitled to recover; for, as Judge Ruggles says in Bank of Commerce v. Union Bank, supra:

"To require the drawee to know the handwriting of the residue of the bill is unreasonable. It would, in most cases, be requiring an impossibility. Such a rule would be not only arbitrary and rigorous, but unjust. The drawee would undoubtedly be answerable for negligence in paying an altered bill, if the alteration were manifest on its face."

And Judge Rapallo, in National Bank of Commerce v. National Mechanics' Banking Ass'n, 55 N. Y. 216, applying the same principle, says:

"The bank was not bound to know the handwriting or genuineness of the filling up of the check. It was legally concluded only as to the signature of the drawer and its own certification. * * * If the defendant had shown that it had suffered loss in consequence of the mistake committed by the plaintiff,—as, for instance, if, in consequence of the recognition by the plaintiff of the check in question, the defendant had paid out money to its fraudulent depositor,—then, clearly, to the extent of the loss thus sustained, the plaintiff should be responsible."

The ground of this distinction between a case where the signature of the drawer of the bill is forged and one where the signature of the drawer is genuine, but the body of the bill has been changed, is apparent. The law imputes to the drawee a knowledge of the drawer's

signature; and, where he pays the bill to which the name of the drawer has been forged, he is guilty of negligence is not applying the knowledge imputed to him, and he will not be permitted to recover the proceeds of the bill from a bona fide holder. On the same reasoning, when the body of the bill has been forged or altered, and the drawee has knowledge thereof when it is presented for payment, and with such knowledge pays it, he has not paid it under a bona fide mistake of fact, which would allow him to recover the money thus paid from the person to whom it has been paid, and who has relied on such payment to his injury. If the drawee has such knowledge, he is bound to apply it; and if he fails to do so, and pays the bill, he is as guilty of negligence as in the case where the knowledge is imputed to him. In either case he cannot recover, because he has been negligent in applying either the knowledge which he actually has, or that which the law ascribes to him; and such negligence prevents a recovery of the money paid.

The rule is recognized in the cases before cited, but is very clearly stated in Clews v. Association (which was three times before the court of appeals) 89 N. Y. 422; 105 N. Y. 401, 11 N. E. 814; 114 N. Y. 70, 20 N. E. 852. Upon the first appeal, when there had been a judgment for the plaintiff, Judge Earl, in discussing the liability of the certifying bank, said:

"When * * * a bank has thus certified a raised check by mistake, and subsequently pays the money thereon, without any culpable negligence on its part, it can recover the amount thus paid as money paid by mistake."

In that case a check had been certified by the defendant, and after such certification it had been altered so as to call for a larger amount than that for which it had been drawn and certified. It was offered to the plaintiffs (purporting to be drawn for $2,540) in payment for $2,500 in government bonds. Before accepting it, the plaintiffs sent it by their messenger to the drawee; and it was presented to the paying teller with the statement that Henry Clews wanted to know if the certification was good. The teller looked at it, and answered, "Yes." Relying upon that statement, the plaintiffs accepted the check in payment for the bonds, and delivered them. The bank, 17 days before the inquiry was made of its teller, had received notice from the drawer of the check that it had been lost, and payment of the original which the defendant had certified was stopped. Upon the second appeal (105 N. Y. 401, 11 N. E. 814), the court held that it was a question for the jury to say whether it was culpable negligence to answer the question without recourse to the certification book and the book of stop payments, which referred to the draft in question by its number, and would have disclosed the fraud; and, upon a subsequent trial, that question was submitted to the jury, and answered in the affirmative, and the judgment in favor of the plaintiffs for the amount of the draft as raised was affirmed by the court of appeals. 114 N. Y. 70, 20 N. E. 852. See, also, Gloucester Bank v. Salem Bank, 17 Mass. 41, where the court says:

"In all such cases, the just and sound principle of decision has been that, if the loss can be traced to the fault or negligence of either party, it shall be fixed upon him."

We have thus the general rule that, to entitle the drawee of a check to recover the amount it has paid upon a raised check, the payment must have been made without culpable negligence, and that where the drawee has received notice that a check has been lost, and payment of it stopped, or facts from which it would appear that it had been raised, and pays the check without examination, and under such circumstances as show culpable negligence, the drawee does not make payment under a mistake of fact which would allow a recovery against a bona fide holder who has parted with or used the amount, relying on the payment of the check by the drawee.

The facts relied upon by the defendant to show culpable negligence of the plaintiff in paying this draft are not in dispute. The Philadelphia National Bank, the drawer of the draft in question, had what is known as an active account with the plaintiff bank, and had occasion to draw drafts upon it almost daily. At the close of each day's business, the Philadelphia Bank invariably notified the plaintiff of all drafts it had drawn upon the plaintiff bank on that day. The officers of both the plaintiff and the Philadelphia Bank testified that there was never any deviation from this rule. These notifications were in the form of letters of advice, as follows: "The following described drafts have this day been drawn by the Philadelphia National Bank upon the Continental Bank, N. Y." Then followed a list, with the serial number of each draft, the name of the payee, and the amount thereof. These letters of advice were received by the plaintiff bank on the morning following the day on which they were written, were delivered to the plaintiff's bookkeeper in charge of the account of the Philadelphia Bank, and were kept by him on a clip, upon his desk. As each draft specified in the letter of advice was certified or paid, the bookkeeper checked the letter of advice, opposite such draft. Thus, the officers of the bank had information, when each draft was presented, which would enable them to ascertain its genuineness, and see if an alteration had been made in it. Each draft could be identified by its number and the name of the payee, and the plaintiff had notice of the amount for which each draft was drawn.

On June 7, 1894, the Philadelphia Bank drew upon the plaintiff a draft, No. 2,269, payable to Henry F. Thompson, for $76, and sent it to Thompson, at Baltimore, by mail, and on the same day sent the plaintiff a letter of advice stating that it had drawn a draft upon the plaintiff, No. 2,269, in favor of Henry F. Thompson, for $76. This letter was received by the plaintiff on the morning of June 8, 1894, and was at that time delivered to the bookkeeper having charge of the account of the Philadelphia Bank, and placed by him upon the clip at his desk. That letter remained continuously before the bookkeeper from the morning of June 8th until it was taken by him from the clip, on the afternoon of June 14th. It contained a notification of all the drafts which had been drawn on June 7th, that in question being the first drawn on that day. There were in all eight of such drafts, the numbers running from 2,269 to 2,276, inclusive. On each of the following days on which drafts were drawn, the Philadelphia Bank sent to the plaintiff a letter of advice of the drafts drawn on the day the letter was sent. On June 12th, advice was given to the

plaintiff of the drawing of 10 drafts, the serial numbers running from 2,287 to 2,297, inclusive; and, by a separate letter, notice was given of a draft, No. 2,302, drawn on the same day; and on June 13th the Philadelphia Bank advised the plaintiff of its drawing one draft on that day with the serial number 2,302.   These letters were, as usual, received upon the day subsequent to their date.

The plaintiff had, therefore, on the morning of June 13th, notice that draft No. 2,269 had been drawn in favor of Henry F. Thompson, for $76, and that on June 12th drafts had been drawn numbered 2,287 to 2,297, inclusive, and one numbered 2,302.   On the morning of June 13, 1894, a draft drawn by the Philadelphia Bank, numbered 2,269, which purported to be dated June 12, 1894, payable to the order of Henry F. Thompson, for $7,660, was presented to the paying teller for certification.   This draft bore the same number, and was payable to the order of the same person, as the one which the plaintiff had been notified had been drawn on June 7th, for $76.   The date, however, was changed to June 12th, and the amount changed to $7,660, instead of $76.   When this draft was presented to the paying teller of the plaintiff bank for certification, he took it to the bookkeeper who had charge of the Philadelphia Bank's account, and who had before him upon the clip on his desk the letters of advice from the Philadelphia Bank; and holding this draft in front of the bookkeeper, so that he could see all parts of it, including the serial number, he said to the bookkeeper, "Is this check all right?"   The bookkeeper said it was.   Whether or not he examined the letters of advice from the Philadelphia Bank at that time, or answered without such examination, does not appear, but he did not make any check on the letter of advice.   The paying teller then went back to his desk, and certified the draft, entering its amount in his certification book, but omitted to enter in his book, as was his custom, the serial number of the draft, and delivered it to the person presenting it for certification.   After this draft had been thus certified, the certification book was delivered to the bookkeeper, and from that he charged up as against the depositor the amount of the draft so certified in the depositor's account.   The evidence is that instructions issued by the plaintiff to the paying teller were, always to inquire of the bookkeeper before certifying a check; that it was the duty of the bookkeeper to ascertain whether or not the account was good for the check presented; and that, where letters of advice were received, it was the duty of the bookkeeper to consult such letters before informing the paying teller in regard to the check.   The bookkeeper testified that when he entered this draft, on the afternoon of June 13th, he noticed that the paying teller had neglected to enter the serial number in the certification book; that at that time he also knew and had in mind the fact that the plaintiff had not received any letter of advice from the Philadelphia Bank that a draft for the amount called for by this certified draft had been drawn.   Thus, his attention was expressly called to the fact that a check for $7,660, which had been submitted to him for inspection, had been certified by the teller, when no advice had been received from the Philadelphia Bank of the drawing of such a draft, he having before him

the letters of advice from the Philadelphia Bank of the drafts which it had drawn upon the plaintiff on June 12th (the date of the draft in question), together with notice of all drafts drawn prior to that time, with the serial number of all drafts drawn, and notice that a draft with this same number had been drawn to this payee for $76. He noticed that the teller in certifying this draft, of which the plaintiff had no advice, had omitted to put in his certification book the number of the draft, which was, as testified to, an unusual occurrence. These facts thus brought to the attention of the bookkeeper on the afternoon of June 13th, he then communicated to the general bookkeeper of the bank. Thus, the officers of the bank had notice of these facts which had been specifically called to their attention on the afternoon of June 13th. It also appears that the drafts drawn and certified under these circumstances are almost invariably.paid through the New York Clearing House, and that, in the usual course of business, that draft would be presented at the clearing house for payment on the following morning. These facts relating to this particular draft thus certified being brought to the attention of the plaintiff's officers, no further inquiry was made by the plaintiff bank concerning it; although it appears that on the next day, in the afternoon, when the cashier's attention was called to the discrepancy between the draft and the letter of advice, the Philadelphia Bank was communicated with by telephone, and within a very few moments information was given to the plaintiff that no such draft had been drawn. If, on the afternoon of June 13th, the officers of the bank had communicated by telephone with the plaintiff bank, as they did on the afternoon of June 14th, we must assume that no difficulty would have been experienced in obtaining at once the information which they obtained on the afternoon of June 14th, viz. that no draft for this amount had been drawn. No such precaution, however, was taken. The officers of the bank simply did nothing.

On June 13th, after the draft had been certified, it was deposited with the defendant bank by Thompson, the payee, who had an account in that bank, and the amount was then placed to his credit. He made no effort to draw any part of the money on June 13th, and on the morning of June 14th the defendant bank presented this draft, so certified by the plaintiff, to the plaintiff for payment, through the clearing house; and the draft was duly paid by the plaintiff. The method of. payment through the clearing house is described by the plaintiff's cashier. He stated that, under the rules of the clearing house, the day after a check or draft is deposited with a member of the clearing house, that draft or check, together with all others drawn upon the same bank, are sent to the clearing house, and they are there exchanged for checks or drafts drawn by other banks upon the bank sending in these drafts. That exchange process is done at 10 o'clock in the morning, at the clearing house. "If the total amount of checks drawn by other banks against our bank exceed the total amount which our bank has drawn against the other banks, then we send the overplus to the clearing house, and they make the payments, distributed, as it may be due, to the other banks. It is a rule of the clearing house that the debit bank must pay in before

half past one, and credit bank cannot receive its credit until after half past one, probably two, o'clock." On June 14th, the plaintiff bank sent to the defendant bank checks and drafts drawn upon it amounting to $505.72; and the defendant bank sent to the plaintiff bank checks and drafts drawn upon it aggregating $8,053.88, which included this certified draft in question, for $7,660; and on that day the credit balance of the defendant bank at the clearing house amounted to upward of $18,000, which included the amount of this draft in question. Thus, on the morning of June 14th, at 10 o'clock, this draft (which, under the rules of the clearing house, would be then presented if deposited on the preceding day with a bank which cleared through the clearing house) was presented at the clearing house to the representative of the plaintiff bank by the representative of the defendant bank, was accepted by the plaintiff's representative there without objection, and returned to the plaintiff, arriving there, as testified to, from about 20 minutes after, to half past, 10 o'clock.

It is the custom of the plaintiff bank, when certified checks are returned from the clearing house, to have them delivered to the check clerk, and he has charge of them during that day. The check clerk compares these certified checks with the entries in the certification book which is kept by the paying teller; and if, upon such comparison, they are found correct, they are then canceled by the bank, and placed in a receptacle or drawer provided for certified checks. When this draft in question was received by the check clerk of the plaintiff bank, on the morning of June 14th from the clearing house, it was by him canceled as paid, and placed in that receptacle, and the credit balance due to the defendant bank from the clearing house was paid by the clearing house. There can be no doubt, I think, that when this draft was examined and found correct by the check clerk, and by him canceled, it was then paid. The evidence is that this generally took place some time between 11 and 1 o'clock. The plaintiff, through its officers, had received this draft from the defendant bank, and had made the examination which they required as to certified checks to ascertain its correctness by a comparison with the certification book. That being found correct, they had canceled the draft, and placed it in the receptacle in which such drafts were kept. Nothing more remained to be done with it, except to return it to drawer when the account of the Philadelphia Bank with the plaintiff was written up. With knowledge of the facts before stated, the plaintiff had paid the draft, without comparing it with the letters of advice, or making any examination as to its genuineness, when any comparison with the letters of advice on the morning it was received would have at once disclosed the forgery.

The defendant requested the court to submit to the jury the question whether the payment of this draft by the plaintiff, under the circumstances, was culpable negligence, so as to preclude the plaintiff from recovering more than the balance of the depositor's account with the defendant bank at the time that notice of the forgery was given to the defendant. The court denied that motion, and directed a verdict

for the plaintiff. We think there was, at least, a question for the jury to determine whether the bank was culpably negligent in paying this check; and if the jury should find that it was so negligent, under the rule before stated, the plaintiff could not recover the proceeds of this draft, which had been actually and in good faith paid out by the defendant before notice of the forgery, relying upon the payment of the draft by the plaintiff. This draft, as before stated, was deposited with the defendant on June 13th, after its certification by the plaintiff. Under the rules of the clearing house, of which both these banks are members, it was delivered to the plaintiff on the morning of June 14th, and was received and paid by it. Under the constitution and rules of the clearing house, in evidence, it is provided that "all checks, drafts, notes, or other items in the exchanges, returned as 'not good' or missent, shall be returned the same day directly to the bank from which they were received." By rule 1 it is provided that "return of checks, drafts, &c., for informality, not good, missent, guaranty of indorsement, or for any other cause, should be made before three o'clock of the same day."

On the afternoon of June 14th, some time after 2 o'clock, the depositor who had deposited this draft with the defendant appeared with three checks, aggregating $7,025, for which he demanded cash. The paying teller of the defendant bank examined his account, and found that he had made a deposit on the day before to an amount which would make his account good for this $7,025. He examined the deposit slip with which that deposit was made, and saw that the deposit was of a check certified by the plaintiff bank. That check having been sent to the clearing house in the morning, and no notice having been received to the contrary, it was assumed to have been paid by the plaintiff bank; and the paying teller paid the check of the depositor, leaving a balance of account to the credit of the depositor of $660. The teller swears positively that these payments to Thompson were made between 2 and 3 o'clock, after the check had been paid by the plaintiff bank, before the forgery had been actually discovered by the plaintiff, and before any notice had been given to the defendant of any irregularity in the check. This brings the case within the illustration stated by Judge Rapallo in National Bank of Commerce v. National Mechanics' Banking Ass'n, supra:

"If the defendant had shown that it had suffered loss in consequence of the mistake committed by the plaintiff, as, for instance, if, in consequence of the recognition by the plaintiff of the check in question, the defendant had paid out money to its fraudulent depositor, then, clearly, to the extent of the loss thus sustained, the plaintiff should be responsible."

Here, if the jury should find that it was culpable negligence on the part of the plaintiff, with the facts which had been called to its attention on the afternoon of June 13th, to receive the draft through the clearing house on June 14th, without making any examination of the draft or comparing it with the letter of advice from the drawer, to cancel it as paid, and hold it until after 2 o'clock; and that the defendant had paid out this money, relying upon the recognition of the draft by the plaintiff, its payment on the morning of June 14th, and

its retention in the plaintiff's hands without objection,—then, to the extent of the loss sustained by the defendant in paying the draft to its fraudulent depositor, the plaintiff would be responsible.

On the afternoon of June 14th, some time after 4 o'clock, the book-keeper of the plaintiff in charge of the account of the Philadelphia Bank, having in mind the facts which had been called to his attention the day before, went to the receptacle in which certified checks were kept, and got out this draft. On comparing it with the letters of advice from the Philadelphia Bank, he at once noticed that there was a discrepancy in the amount of this draft, and, taking the draft and the letter of advice, he brought them to the attention of the cashier of the plaintiff bank. The cashier at once communicated with the Philadelphia Bank, as before stated, by telephone, and received information which disclosed the forgery. He at once went to the defendant bank, arriving there about 5 o'clock in the afternoon, when the principal officers of the bank had left the banking house; and subsequently, in the evening of the same day, he notified the cashier of the defendant bank. Efforts were made the next morning to arrest the person who had obtained the money from the defendant bank, but without success. On the morning of June 15th, this depositor attempted to cash another check at the defendant bank, and also offered for deposit another draft drawn on another bank in New York. It thus appeared that he was in New York on the morning of June 15th, but he subsequently disappeared, and no trace of him could be found. Thus, the plaintiff did not discover the forgery until about half past 4 o'clock on the afternoon of June 14th, although it is apparent that if any examination of this draft had been made at any time before 2 o'clock, and the defendant notified, the money would not have been paid to the forger, and no loss would have been sustained.

Under the rules and constitution of the clearing house, as before stated, the plaintiff was required to return the draft before 3 o'clock on the day on which it was presented. The legal situation of the plaintiff bank does not, however, depend upon these rules of the clearing house. As a matter of fact, the draft was not returned before 3 o'clock of the day upon which it was paid. Whether or not a return before 3 o'clock would, under the rules of the clearing house, have exonerated the plaintiff, it is not necessary for us to determine. It was, we think, at least a question for the jury to determine whether or not, with the knowledge of the facts which had been communicated to the officers of the plaintiff, it was culpable negligence on their part to receive this draft as they did on the morning of June 14th, at about half past 10 o'clock, without examination or verification, and to retain it until after 2 o'clock; and if the jury should find in the affirmative, and that the defendant made the payment to its depositor relying upon the acceptance and payment of the draft by the plaintiff, the defendant would be exonerated from liability for anything more than the amount remaining in its hands to the credit of the fraudulent depositor, when notice of the forgery was given to the defendant.

As the application to submit these questions to the jury was denied by the court, the judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.